UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                        :

THERESA R.[1],                   :          3:20 CV 1885 (SRU)
*Plaintiff,*            :
                        :
V.                      :
                        :
KILOLO KIJAKAZI,[2] ACTING   :
COMMISSIONER OF SOCIAL   :
SECURITY,             :
*Defendant.*           :
                        :          DATE: FEBRUARY 15, 2022
                        :
------------------------------------------------------- x

RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE
DECISION OF THE COMMISSIONER AND ON THE DEFENDANT'S MOTION TO
AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under §§ 205(a) and 1631(c)(3) of the Social Security Act as amended,

and 42 U.S.C. §§ 405(g) and 1383(c), seeks review of a final decision by the Commissioner of

Social Security ("SSA") denying the plaintiff disability insurance benefits ("DIB") and

Supplemental Security Income ("SSI").

I.    ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for SSI and DIB on March 6, 2018, alleging disability

beginning February 24, 2018[3] due to "anaphylactic reaction, food allergies, fragrance allergies,

depression, anxiety, high blood pressure, sever[e] GERD, and diabetes." (Doc. No. 14, Certified

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. *See* 42 U.S.C. § 405(g).

[3] The plaintiff, through her attorney, amended her alleged onset date from June 15, 2015 to February 24, 2018. (Tr. 40, 299).

Transcript of Administrative Proceedings, dated May 3, 2021 ["Tr."] 313). The plaintiff's application was denied initially and upon reconsideration, and on December 17, 2019, a hearing was held before Administrative Law Judge ("ALJ") Matthew Kuperstein, at which the plaintiff and Peter A. Manzi, a vocational expert, testified. (Tr. 15). The plaintiff was represented by counsel at this hearing. (*Id.*). On February 20, 2020, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 12-27). On March 20, 2020, the plaintiff requested review from the Appeals Council (Tr. 7-9), and on October 20, 2020, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On December 18, 2020, the plaintiff filed her complaint in this pending action. (Doc. 1). Absent consent to a Magistrate Judge, this case was referred to the undersigned for all purposes, including issuing a recommended ruling. (Doc. No. 9). On July 29, 2021, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 18), with a Statement of Material Facts (Doc. No. 18-2), and a brief in support (Doc. No. 18-1 ["Pl.'s Mem."]). On October 28, 2021,[4] the defendant filed his Motion to Affirm (Doc. No. 22), with a Statement of Material Facts (Doc. No. 22-2), and a brief in support (Doc. No. 22-1 ["Def.'s Mem."]).

For the reasons stated below, the Court respectfully recommends that the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 18), be **DENIED**, and the defendant's Motion to Affirm (Doc. No. 22) be **GRANTED**.

II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the Statements of Facts. (Doc. Nos. 18-2, 22-2). Though the Court has reviewed the

---

[4] The Commissioner filed a Consent Motion for Extension of Time until November 1, 2021 to file its responsive brief (Doc. No. 20), which was granted. (Doc. No. 21).

entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

A.    PLAINTIFF'S TESTIMONY

The plaintiff testified before the ALJ on December 17, 2019.[5] (Tr. 36). On the date of the hearing, the plaintiff was fifty-two years old, had no children, and was living in a home with her boyfriend of twenty years, who was employed. (Tr. 41-42). The plaintiff had completed high school and had previously been employed as a bookkeeper for a real estate business from May 2001 through February 2018. (Tr. 42, 50). The plaintiff indicated that she had not done any work or volunteer activity since February 24, 2018. (Tr. 42-43).

The plaintiff testified that she could not work on a regular basis because "the smell of perfumes, colognes . . . cleaners, any strong scent" caused her to "have a hard time breathing," gave her "no voice, and it happens right away." (Tr. 43). Moreover, she stated that it took her "hours to recover from it due to exhaustion, no voice, and [she had] gone from hours to eleven days [with] no voice due to an attack." (Tr. 43). When the plaintiff had been working, she stated that was out "three to four days a week" towards the end of her employment because she would go into the office, have to call an ambulance "before [she] really knew what was happening," and then stay home for two to three days. (Tr. 47).

On examination, the plaintiff stated that she had no voice for the entire eleven-day episode; her usual recovery process involved "a headache, a lot of chest pain, tightness, [and] back pain" that typically lasted two to three days. (Tr. 44). She stated that she got "sore for a couple [of] days" and that it was "severe," took a lot of energy, and "the stress of it [was] very hard." (Tr. 44).

_____

[5] The plaintiff initially appeared for a hearing on May 28, 2019, but she had to leave at the commencement of the hearing; she was losing her voice and felt she was having a reaction to something in the hearing room. (Tr. 15, 71-74). The vocational expert testified and was questioned in both hearings.

3

Regarding the exhaustion, the plaintiff stated that she usually ended up taking a nap for "a good hour or two" once her attack had subsided (Tr. 45); regarding the stress, the plaintiff stated that it stemmed from the fear of whether she was going to have an attack and when it would happen, as well as the stress of trying to stay calm around others while she was "gasping for air." (Tr. 44-45).

The plaintiff stated that she had her driver's license and her own car, but only drove herself to her doctor's appointments; otherwise, she did not drive anywhere else and had not done any traveling since February 24, 2018. (Tr. 42). The plaintiff stated that she went to the doctor when she had an "attack" and "[sat] there with no voice and [tried] to breathe through them"; "[e]very doctor's appointment [she had] attended . . . [she] always had an attack." (Tr. 43). The plaintiff stated that her last attack was the day prior to the hearing and had been caused when her boyfriend called a plumber into the house to fix the furnace, and the plumber had been wearing cologne. (Tr. 45). She stated that she was still sore and tired from her attack yesterday. (Tr. 45). The plaintiff claimed that she typically had one or two attacks each week, depending on whether she went outside, and noted that she had an attack once when someone was doing laundry. (Tr. 47-48).

The plaintiff testified that her attacks were "very physically tiring . . . to where if [she] had to go to work [at that moment, she] would not be able to properly function because [she was] exhausted." (Tr. 46). The plaintiff testified that, according to her doctors, there was no cure for this condition, nor any medication; instead, she should "avoid everything." (Tr. 46). The plaintiff did indicate, however, that she developed an exercise to try and help her breathe through her attacks, which helped her get through them "without having to go to the emergency room" by "slow[ing] down the spasm, but . . . eliminat[ing] the pain or the fatigue of [the attack]." (Tr. 48).

B.    <u>VOCATIONAL EXPERT'S TESTIMONY</u>

The vocational expert stated that the plaintiff had previously worked as a bookkeeper for a real estate office, which is a sedentary and skilled position. (Tr. 50, 78-79). The vocational expert was asked about a hypothetical person with the same age and education as the plaintiff, who could do light exertional work with only frequent climbing of ramps or stairs, stooping, kneeling, crouching or crawling; never do work that involved climbing of ladders, ropes, or scaffolds; and avoid more than occasional exposure to fumes, odors, dust, gases, or poor ventilation. (Tr. 51, 80). The vocational expert stated that such a hypothetical individual could do work that had previously been done by the plaintiff. (Tr. 51, 80-81). When the ALJ further restricted the limitations to work that did not involve fumes, odor, dust, gas, or poor ventilation, the vocational expert testified again that such a hypothetical individual could do work that had previously been done by the plaintiff. (Tr. 51, 81).

The vocational expert testified that, in addition to regular scheduled work breaks per day, an employer would tolerate no more than 15 percent of a typical workday being spent off-task by an employee. (Tr. 51-52, 81-82). When asked about the typical level of tolerance for a bookkeeper, however, the vocational expert stated that the off-task threshold was five to ten percent because of the need for accuracy and detail. (Tr. 52). Additionally, an employer would only tolerate up to two full days per month of unscheduled absenteeism. (Tr. 54, 82). Absenteeism included coming in late, leaving early, or any other time the employee was removed from the work setting; an employer would not tolerate this if it added up to more than two eight-hour shifts in a given month. (Tr. 55, 82). While the vocational expert stated that there was some flexibility regarding sick time, he also stated that being consistently an hour late or leaving an hour early, where the absenteeism time added up to sixteen hours, would also be a problem. (Tr. 56, 84-85). On examination, the

vocational expert stated that distracting behavior that interfered with other employee's ability to complete work timely or accurately would similarly only be tolerated up to ten percent of the workday. (Tr. 54-55). The plaintiff's counsel asked about pulmonary irritants, including light fumes, like soaps, lotions, and deodorants. (Tr. 57). The vocation expert replied that bookkeeping was a solitary job, and that, though there would be some interactions with people who might be using soaps, lotions, and deodorants, it was not permissible to ask coworkers not to wear cologne or perfume. (Tr. 57-58, 83-84).

III.   THE ALJ'S DECISION

Following the five-step evaluation process,[6] the ALJ found that the plaintiff had not engaged in substantial gainful activity since March 2018. (Tr. 18, citing 20 §§ CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b), and 416.971 *et seq.*). While the plaintiff had previously testified that she stopped working on February 24, 2018 (Tr. 42, 50), Dr. Michael Bar indicated that the plaintiff was employed as a bookkeeper at a real estate company on March 12, 2018. (Tr. 18). The plaintiff did not provide further information to support that she stopped working on February 24, 2018. (*Id.*). Pursuant to 20 C.F.R. § 404.1574, claimants who earn at least $1,180 per month in 2018 were engaged in substantial gainful activity. (Tr. 18). Based on the 2018 W2 that the plaintiff

---

[6] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, the claimant will have to show that she cannot perform her former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

provided, her first quarter 2018 earnings totaled $10,800, or approximately $3,600 per month. (*Id.*) Therefore, the ALJ found that the plaintiff had worked above substantial gainful activity levels in the first quarter of 2018. (*Id.*). The ALJ then noted that there had been a twelve-month period since the alleged onset date during which the plaintiff had not engaged in substantial gainful activity and continued his analysis. (Tr. 19).

At step two, the ALJ found that the plaintiff had the following severe impairments: anaphylactic reactions, food allergies, and obesity. (Tr. 19, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart p, Appendix 1. (Tr. 21, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). Specifically, the plaintiff's physical impairments did not meet or medically equal the criteria of listings 3.00 (respiratory disorder) or 14.00 (immune system disorder). (Tr. 21).

The ALJ concluded that the plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with the following modifications: she could frequently climb ramps and stairs, as well as stoop, kneel, crouch, and crawl; she could not, however, climb ladders, ropes, or scaffolds; and needed to avoid more than occasional exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 22).

At step four, the ALJ concluded that the plaintiff was capable of performing her past relevant work as a bookkeeper because that work did not require the performance of work-related activities precluded by the plaintiff's RFC. (Tr. 26, citing 20 C.F.R. §§ 404.1565, 416.965). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from

February 24, 2018, the date of alleged disability, through the date of the ALJ's decision, February 14, 2020. (Tr. 27, citing 20 C.F.R. §§ 404.1520(f), 416.920(f)).

IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Further, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v.*

*Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff argues that the ALJ erred in two respects. First, the ALJ misstated and misevaluated the record when he found that the plaintiff's only "severe" impairments at step two were anaphylactic reactions, food allergies, and obesity. (Pl.'s Mem. at 7). Second, the ALJ's assessment of the plaintiff's RFC did not adequately address the plaintiff's severe allergies. (*Id.* at 8). The defendant denies these allegations and states that the ALJ's decision was supported by substantial evidence. (Def.'s Mem. at 3). The defendant claims that the administrative record was properly developed (*id.* at 4), the appropriate level of consideration was given to the alleged severity of the plaintiff's medical impairments (*id.* at 5), and the ALJ drew proper and reasonable inferences from the medical record and considered the plaintiff's subjective allegations in assessing her RFC. (*Id.* at 6).

A.    THE ALJ DID NOT ERR AT STEP TWO

At step two, the ALJ must determine the severity of a claimant's asserted impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii); *see also id.* at (c). An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities, *see Social Security Ruling* ("SSR") 96–3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996); likewise, an impairment is "non-severe" if it is only a slight abnormality that has a minimal effect on a claimant's ability to perform basic work activities. *Id.* The claimant bears the burden of proof at step two in establishing severity, such that the mere presence of diagnosis of a disease, impairment, or treatment thereof is not, by itself, sufficient to render a condition severe. *Bailey v. Berryhill*, No. 3:18-CV-00013 (WIG), 2019 WL

427320, at *3 (D. Conn. Feb. 4, 2019) (citing *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012)).

Here, the ALJ found that "mast cell disorder,[7] mast cell activation syndrome[8] and systemic mastocytosis[9] [were] not medically determinable impairments of the claimant" because the plaintiff had failed to prove that these ongoing disorders were "severe." (Tr. 21). The ALJ also found that the plaintiff's depression and anxiety were not severe because they caused no more than "mild" limitations. (*Id.* at 20-21). The plaintiff argues that the ALJ erred by (1) conflating "systemic mast cell activation syndrome" with "idiopathic mast cell activation syndrome" as the potential diagnoses underlying the plaintiff's allergic reactions, and (2) relying on "testimony which the claimant did not give, or on an inconsistency that did not exist" to determine that the plaintiff's depression and anxiety were not severe. (Pl.'s Mem. at 7, 10). The defendant counters that the ALJ did not err at step two because the ALJ found other severe impairments, "including impairments that cause respiratory distress." (Def.'s Mem. at 3). Moreover, regarding the ALJ's assessment of the plaintiff's mental health, the defendant counters that the mere existence of a mental health impairment does not demonstrate that it is a severe impairment, and the plaintiff has

---

[7] Mast cell disorder, also known as "systemic mast cell activation disease," is an umbrella term for disorders characterized by an enhanced release of mast cell mediators (*e.g.*, histamines) that is sometimes comorbid with an accumulation of dysfunctional mast cells—or cells that release antibodies that bind to allergens—which may or may not be detectable. *See* Gerhard J. Molderings et al. *Mast cell activation disease: a concise practical guide for diagnostic workup and therapeutic options*. 4 J HEMATOL ONCOL. 10 (2011). The disorders captured under this umbrella term are mast cell activation syndrome ("MCAS"), systemic mastocytosis ("SM"), and mast cell leukemia. *Id.*

[8] MCAS is a condition in which mast cells release too many mediators. *See* Theoharis C. Theoharides, Peter Valent, and Cem Akin. *Mast Cells, Mastocytosis, and Related Disorders*. 373(2) N ENGL J MED. 163-72 (2015). Symptoms include, *inter alia*, flushing, itching, wheezing, coughing, lightheadedness and rapid pulse and low blood pressure. *Id.* MCAS is also known as idiopathic mast cell activation syndrome because the episodes of high mediator release are "idiopathic," or caused by an unknown mechanism. *Id.* Stated simply, the episodes are not caused by an allergic antibody or secondary to other known conditions that activate normal mast cells. *Id.*

[9] SM is a disorder in which abnormal mast cells are increased in one or more organs and release mediators in response to allergens, but also non-specific stimuli (*e.g.*, changes in temperature, stress, alcohol, and exercise). *See Theoharides* at 163-72. Abnormal mast cells in systemic mastocytosis may also generally be more prone to releasing mediators. *Id.* Symptoms include, *inter alia*: anaphylaxis, itching, flushing, hives, swelling, wheezing or shortness of breath, sinus congestion and pressure, throat swelling, palpitations, changes in blood pressure, dizziness, and fainting. *Id.*

not met her burden of proof to demonstrate that her depression and anxiety were severe. (Def.'s Mem. at 5).

1.      THE ALJ DID NOT ERR IN FINDING THE PLAINTIFF'S ALLEGED "MCAS" TO BE NON-SEVERE

It is unclear whether the plaintiff is referring to "systemic mast cell activation disease" or "SM" when she states that her healthcare providers "had been considering either systemic mast cell activation syndrome or ['MCAS']" as the condition underlying the plaintiff's allergic reactions. (*Id.* at 7). To the extent that the plaintiff argues that the ALJ erred in not considering "MCAS" after "systemic mast cell activation disease" had been ruled out, it is important to note that "MCAS" is encompassed within "systemic mast cell activation disease." *See* n.7, *supra*. Should it be the case that the plaintiff is indeed arguing that "MCAS" should have still been considered after "systemic mast cell activation disease" had been ruled out, the plaintiff appears to concede that "MCAS" could not have been an underlying diagnosis that required a severity determination by the ALJ. (Pl.'s Mem. at 7 ("[T]he mere *fact* that 'systemic mast cell disorder' is not the culprit, does not mean that idiopathic mast cell activation syndrome is ruled out." (emphasis added)); *see also* Tr. 656 (Dr. Michael H. Bar, M.D., at Hematology Oncology, P.C. determining there was "no evidence to suggest that [the plaintiff] had a systemic mast cell disorder" on March 28, 2018)).

This distinction between "systemic mast cell activation disease" and "SM" ultimately does not matter, however, because the plaintiff has not met her initial burden of establishing that she has "MCAS." On June 28, 2017, allergy and immunology specialist Dr. Mark Litchman, M.D., indicated that the plaintiff was suspect for a hypersensitive state with possible "MCAS" after observing "[r]ecurring allergic reactions which include flushing, laryngeal/pharyngeal edema and more recently possibly asthma." (Tr. 431). Dr. Litchman further noted on October 18, 2017 that

the plaintiff needed a "genetic test for mast cell disease that is difficult to obtain" and that it "[w]ould be best if [the plaintiff] went directly to [the testing] lab and not a draw station for these tests." (*Id.* at 470). The record does not appear to contain any evidence suggesting that the plaintiff was able to undergo the "genetic test for mast cell disease" that Dr. Litchman recommended. Testing was again recommended by Dr. Sowmya Murthy Gadey, M.D., after the plaintiff presented to the emergency room multiple times between January 2018 and February 2018 with complaints associated with her allergic reactions. (*Id.* at 607 (01/12/18 (difficulty breathing and swallowing)), 614 (01/22/2018 (sensation of throat closing and low blood pressure)), 621 (02/07/18 ("history of idiopathic allergic reactions," hoarseness, "scratchy throat," and "barky cough")), 628 (02/09/18 (dyspnea, sensation of throat closing, "very quiet voice"))). However, on February 15, 2018, allergy and immunology specialist Dr. Elise Liu, M.D., at Yale School of Medicine Allergy & Immunology, indicated that "[t]ypical treatment of MCAS ha[d] not been helpful for [the plaintiff]" and agreed to further evaluate her symptoms for other etiologies. (Tr. 442). During that same visit, attending physician Christina C. Price, M.D., added that "[g]iven the non-response to the mediation, [the plaintiff] did not fit the diagnosis of MCAS." (*Id.*). There is no other evidence after February 2018 that the plaintiff either received treatment for "MCAS" or was otherwise diagnosed with "MCAS." Therefore, the ALJ's determination that the plaintiff's "MCAS" was not severe is supported by substantial evidence because "[a] lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits." *Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015) (citing *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012)).

Moreover, even if the plaintiff had presented evidence that her healthcare providers had indeed diagnosed her with "MCAS," the ALJ considered the plaintiff's anaphylactic reactions to be severe, for which "MCAS" was considered a potential underlying diagnosis. The defendant is correct in stating that the symptoms remained the same despite the label—shortness of breath and the feeling of the plaintiff's throat closing. (Def.'s Mem. at 4; *see also*, Tr. 607, 614, 621, 628). The defendant is further correct in stating that step two is a threshold analysis to ascertain "whether there is sufficient evidence to proceed through the rest of the sequential evaluation process." (Def.'s Mem. at 4). As such, because the ALJ considered the plaintiff's anaphylactic reactions to be severe, and anaphylactic reactions encompass the same symptoms as the plaintiff's "MCAS," the ALJ's failure to identify the plaintiff's potential "MCAS" as severe is, at best, harmless error. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding harmless error where ALJ identified other "severe impairments" and considered non-severe impairments at subsequent steps); *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (finding harmless error where ALJ's consideration of doctor's report would not have affected ALJ's adverse determination); *Lumpkin v. Saul*, No. 3:19-CV-01159 (WIG), 2020 WL 897305, at *3 (D. Conn. Feb. 25, 2020) (finding that "the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence," so long as all impairments are considered in remaining steps) (internal quotations and citations omitted).

## 2.    THE ALJ DID NOT ERR IN FINDING THE PLAINTIFF'S DEPRESSION AND ANXIETY TO BE NON-SEVERE

The plaintiff argues that, in finding the plaintiff's depression and anxiety to be non-severe, the ALJ relied on "testimony which the claimant did not give, or an on inconsistency that did not exist." (Pl.'s Mem. at 10). The defendant counters that the ALJ properly determined that the plaintiff's alleged depression and anxiety were medically determinable, but not severe under the

four-factor analysis as delineated in the Social Security Act, 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04 and 12.06. (Def.'s Mem. at 4).

The plaintiff conflates her burden of proof with the ALJ's standard of substantial evidence. When reviewing the record, the ALJ is only required to develop the record fully and fairly; this does not require him to discuss every piece of evidence in the record, whether it is cited in his decision or not. *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted). While the ALJ will consider "all of [a claimant's] statements about [her] symptoms," the ALJ must also have "objective medical evidence from an acceptable medical source" that "could reasonably be expected to produce the pain or other symptoms alleged" to find a medical impairment. 20 C.F.R. § 416.929(a). Therefore, as discussed above, the *plaintiff* bears the burden of proof at step two in establishing severity, and a lack of supporting evidence here, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits. *Barry*, 606 F. App'x at 622 (citing *Talavera*, 697 F.3d at 153); *Reynolds v. Colvin*, 570 F. App'x 45, 47 (2d Cir. 2014) (same).

The ALJ first addressed a state agency consultant's opinion as part of his analysis. The ALJ is entitled to rely on the opinions of state agency consultants, provided those opinions are consistent with the record as a whole. *See Wessel v. Colvin*, 3:14CV00184 (AVC), 2015 WL 12712297, at *7 (D. Conn. Dec. 30, 2015) (citation omitted); *see also Frye ex rel. A.O.*, 485 F. App'x 484, 487 (2d Cir. 2012) (holding that,"[t]he report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record"); *Baszto v. Astrue*, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010) ("It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency

medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.").

In March 2018, the state agency consultant, Dr. Katrin Carlson, Psy.D., opined that the plaintiff had no limitations in understanding, remembering or applying information, interacting with others, concentrating, persisting or maintaining pace, nor adapting or managing herself. (Tr. 96-97). The ALJ found Dr. Carlson's opinion persuasive because it was supported by the evidence that the plaintiff's depression and anxiety were stable under her medication plan. (Tr. 20). Moreover, the ALJ stated that Dr. Carlson's assessment was also consistent with the other evidence of record, in that there were no documents indicating that the plaintiff had undergone treatment by a mental health professional or required inpatient psychiatric hospitalization. (*Id.*). The ALJ also noted that the plaintiff had normal mental status examinations on November 15, 2018 (*id.* at 949 ("Mental status exam performed with findings of – Oriented X3 with appropriate mood an affect, able to articulate well with normal speech/language, rate, volume and coherence and attention span and ability to concentrate are normal."), and December 9, 2018 (*id.* at 946 (same)) during her appointment for her allergies with Dr. Sharyu A. Bande, M.D. (*Id.* at 20).

The ALJ also engaged in the four-category analysis for mental disorders known as the "Paragraph B" criteria: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 20-21). Under "Paragraph B," the claimant's mental impairment must result in at least two of the following: marked restriction of daily living activities, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, or repeated episodes of decompensation, each of extended duration. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). Based on the evidence in the record, the ALJ could not find any instances of the plaintiff having issues

in any of the four Paragraph B categories—in fact, the record indicates that the plaintiff was repeatedly found to be "oriented" (*see e.g.*, Tr. at 640 (02/21/18 ("oriented to time, place, and person")), 825 (03/16/18 (same))), "pleasant" (*see e.g.*, *id.* at 589 (06/13/17 ("pleasant, alert to person, place, and time"), 887 (10/18/18 ("mood and affect well-adjusted, pleasant and cooperative, appropriate for clinical and encounter circumstances"))), and to have "normal speech/language" (*see e.g., id.* at 946 (12/09/18 ("able to articulate well with normal speech/language, rate, volume, and coherence"))). The plaintiff was also able to drive herself to her medical appointments, indicating that she was able to manage herself enough to keep a schedule. (*Id.* at 42). The plaintiff did not present any evidence to suggest that her alleged depression and anxiety were severe, and the ALJ's assessment of her mental health limitations was supported by substantial evidence.

Moreover, an ALJ does not err in determining that a claimant's mental impairment is non-severe where the impairment is "effectively managed through medication." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order); *see Zabala*, 595 F.3d at 410 (affirming ALJ's denial of benefits where "[t]he reports of [the claimant's] treating psychiatrists and most of her consulting doctors during the review period indicate[d] . . . that her condition improved with medication"). The plaintiff's depression was noted as "Present" during a mental status evaluation as part of her medical visit with Dr. Frank Sammarco, M.D., on November 15, 2018 (Tr. 949), though the plaintiff's depression and anxiety were both noted as "Not Present" by Dr. Sharyu A. Bande, M.D., in the mental status evaluation during the plaintiff's December 9, 2018 medical visit. (*Id.* at 946). And, as of July 16, 2019, Dr. Bande described the plaintiff's anxiety as "stable" after she had started a course of Paxil, having previously been prescribed Xanax and provided an emotional support dog. (*Id.* at 1264). At this same visit, the plaintiff was documented as having

appropriate mood and affect, and she was able to articulate well with normal speech. (*Id.*). The ALJ also appropriately noted that the plaintiff "rarely complained" of her depression and/or anxiety, as the record showed only two instances other than the July 2019 visit in which the plaintiff discussed her mental health with a healthcare provider. (*See id.* at 638, 1024-29 (02/21/2018 (discussed anxiety attacks with doctor; prescribed Xanax)); 823 (03/16/2018 (discussed anxiety and depression during annual physical)).

Therefore, the ALJ correctly determined that the plaintiff's depression and anxiety were non-severe because these conditions did not meet the Paragraph B criteria and, regardless, remained stable with medication.

B.    THE ALJ DID NOT ERR IN HIS RFC ASSESSMENT AT STEP FOUR

Moving to step four, the ALJ determined that the plaintiff's RFC included:

> . . . light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can frequently climb ramps or stairs, stoop, kneel, crouch, or crawl. She can never climb ladders, ropes or scaffolds. She needs to avoid more than occasional exposure to fumes, odors, dusts, gases or poor ventilation . . .

(Tr. 26). The plaintiff's argument pertaining to this RFC determination is two-fold: first, that the ALJ erred in his credibility assessment of the plaintiff's testimony regarding the "intensity, persistence and functionally limiting effects of her symptoms" (Pl.'s Mem. at 8); and second, that the plaintiff must avoid *all* exposure to pulmonary irritants, and that the exclusion of light pulmonary irritants from the RFC was error because these irritants have previously sent the plaintiff to the hospital. (Pl.'s Mem. at 11). The defendant insists that the ALJ properly formulated the RFC based on the evidence in the record. (Def.'s Mem. at 6-7).

Here, the ALJ stated that, while he found that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not

consistent with the medical evidence and other evidence in the record. (Tr. 22). The ALJ accurately

noted the plaintiff's testimony concerning her symptoms, including the fact that the plaintiff stated

that she experienced allergic reactions one to two times per week; however, he found that the

plaintiff's testimony about the intensity, persistence, and functionally limiting effects of her

symptoms was not "fully supported by the objective medical evidence in the record." (*Id.*). In

particular, the ALJ found that the plaintiff's "routine medical treatment and infrequent emergency

room visits" failed to support her allegations of "severe allergic reactions one to two times per

week." (*Id.* at 24). Moreover, the ALJ found that the plaintiff's "admission that she ha[d] not

sought treatment from Mount Sinai Allergy for years, and only received treatment from her

Connecticut medical provider" was also inconsistent with a level of severity that would preclude

the plaintiff from working, "as a person in as much distress as [the plaintiff] alleged due to severe

allergic reactions would seek more specialized care." (*Id.* at 24).

To the extent that the plaintiff is arguing that the ALJ erred in his credibility assessment of

the plaintiff's testimony related to her allergic reactions (*i.e.*, the frequency of her hospital visits

and the lack of continued visits to the specialists at Mount Sinai), "[i]t is the function of the [ALJ],

not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of

witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642

(2d Cir. 1983) (citing *Richardson v. Perales*, 402 U.S. 399 (1971)) (additional citations omitted).

When analyzing a plaintiff's credibility, the ALJ must first determine whether the plaintiff has any

medically determinable impairments "which could reasonably be expected to produce the pain or

other symptoms alleged." 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also McLaughlin v. Sec'y of

Health, Educ. & Welfare,* 612 F.2d 701, 704-05 (2d Cir. 1980). If a medically determinable

impairment is shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of

the symptoms to determine the extent to which those factors limit the plaintiff's ability to work. 20 C.F.R. §§ 404.1529(a), 416.929(a). Then, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility[, the ALJ] may decide to discredit the claimant's subjective estimation of the degree of impairment." *Acevedo v. Saul*, No. 20 CIV. 8027 (GWG), 2021 WL 6110933, at *5 (S.D.N.Y. Dec. 27, 2021) (citing *Tejada v. Apfel*, 167 F.3d 770, 775-76 (2d Cir. 1999) (additional citations omitted). Should the ALJ find that the plaintiff's allegations are not fully credible, the ALJ must state the reason "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Young v. Astrue*, No. 7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)). It should be noted that the ALJ's determination of credibility is entitled to deference. *See Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) ("After all, the ALJ is in a better position to decide issues of credibility."); *Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination because he heard plaintiff's testimony and observed his demeanor.").

Prior to examining the medical evidence, it bears repeating that the relevant period under review for the plaintiff's benefits runs from February 24, 2018, her amended onset date, through February 14, 2020, the date of the ALJ's decision. *See* 42 U.S.C. § 423(c)(1)(B)(i); 20 C.F.R. § 404.130; *see also Hamm v. Colvin*, No. 16cv936 (DF), 2017 U.S. Dist. LEXIS 54744, at *3 (S.D.N.Y. Mar. 29, 2017) (citing *Roman v. Colvin*, No. 13cv7284 (KBF), 2015 WL 4643136, at *1 & n.2 (S.D.N.Y. Aug. 4, 2015)). An ALJ is not required to cite or discuss every piece of evidence in the record, *see Bonet ex rel. T.B.*, 523 F. App'x at 59; *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 78-79 (N.D.N.Y. 2005) (stating that "'an ALJ is not required to discuss

all the evidence submitted, and [his] failure to cite specific evidence does not indicate that it was

not considered'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)), nor does an ALJ

have to consider evidence outside of the relevant period in question, *see Krach v. Comm'r of Soc.*

*Sec.*, No. 3:13-CV-1089 (GTS/CFH), 2014 WL 5290368, *9 (N.D.N.Y. Oct. 15, 2014) (stating

that "the ALJ is under no obligation to consider evidence from a time before the relevant period");

*McManus v. Comm'r of Soc. Sec.*, 298 F. App'x 60, 61 (2d Cir. 2008) (summary order) (finding

"no error" when ALJ excluded additional evidence that plaintiff offered because the evidence "pre-

dated the time period the ALJ was required to consider"). Moreover, "[a] lack of supporting

evidence . . . where the claimant bears the burden of proof, particularly coupled with other

inconsistent evidence, can constitute substantial evidence supporting a denial of benefits."

*Reynolds v. Colvin*, 570 F. App'x 45, 47 (2d Cir. 2014) (summary order).

    With this in mind, the ALJ's credibility analysis regarding his emphasis on the plaintiff's

lack of visits to allergy specialists at Mount Sinai remains supported by substantial evidence. The

record indicates that the plaintiff did not see *any* specialists—allergy or otherwise related—after

February 2018. (*See* Tr. 435 (10/18/2017 (saw Dr. Mark Lichtman, M.D. (allergy and immunology

specialist) and reported less frequent reactions following not leaving the house as much over past

six weeks, but being in the hospital for six hours a week ago after a reaction to fresh paint caused

tight throat, tight chest, and wheezing; self-administered EpiPen and called 911; discharged from

hospital after six hours and "has been fine since then")); 631-35 (02/12/2018 (saw Dr. Michael H.

Bar, M.D. (hematology and oncology specialist) for tests for laryngospasms triggered by odors,

with possible diagnosis of clonal mast cell disorder/systemic mastocytosis or idiopathic mast cell

activation syndrome; follow-up tests ordered)); 439-42 (02/14/2018 (met with Dr. Elise Liu, M.D.

(allergy and immunology specialist), who stated mast cell activation syndrome was not the proper

diagnosis, favored vocal cord dysfunction, and recommended additional testing))). As such, the ALJ's credibility determination regarding the severity of the plaintiff's allergies in light of her admission that she had not sought treatment from Mount Sinai Allergy for years is supported by the medical evidence in the record. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)) ("Where application of the correct legal standard could lead to only one conclusion, we need not remand.").

Regarding the ALJ's assessment of the plaintiff's medical treatment and emergency room visits, the Court has reviewed the plaintiff's medical records prior to the relevant period. (*See* Tr. 478, 482 (03/28/2017 (presented to emergency room for "major" allergic reaction; received a dose of epinephrine and was discharged)); 470-72 (10/13/2017 (presented to emergency room via ambulance for shortness of breath; resolved in approximately hour and a half and was "much improved" upon discharge with a dose of prednisone administered that same day)); 465 (10/28/2017 (presented to emergency room via ambulance for shortness of breath after plaintiff had reaction to her office being painted and stopped prednisone five days prior to treat gastrointestinal disease; relieved by second dose of epinephrine administered by EMS and racepinephrine administered at hospital)); 596, 599 (11/06/2017 (presented at emergency room via ambulance for allergic reaction to food; discharged after administered epinephrine, steroids, and antihistamines)); 601-02 (01/12/18 (arrived at emergency department for allergic reaction to fumes at gas station)); 609 (01/22/18 (presented at emergency department via ambulance for allergic reaction to gasoline fumes; discharged with steroids after three hours of observation)); 460, 578 (02/02/18 (arrived at emergency department for allergic reaction from perfume with shortness of breath; given epinephrine and antihistamines and discharged after four hours)); 621 (02/07/18 (arrived at emergency department for allergic reaction to perfume at work with shortness of breath;

self-administered epinephrine twice and antihistamines)); 623, 626 (02/09/18 (arrived at emergency department for allergic reaction to gasoline fumes with shortness of breath; later felt "much better" and "eager to go home"); 1057-63 (02/14/18 (same)); 453-54 (02/22/18 (arrived at hospital via ambulance for allergic reaction to hand gel; self-administered antihistamine and epinephrine prior to arrival and discharged same day))). As discussed above, though the ALJ was not required to review this information because it predated the plaintiff's onset date, this medical evidence does not alter the ALJ's analysis or undermine the conclusion that his RFC determination was supported by substantial evidence.

The earliest medical evidence within the relevant period appears to stem from a February 26, 2018 hospital visit after the plaintiff had an allergic reaction to contrast dye used in a CT scan. (Tr. 708, 760-61). She was sent to the emergency department and discharged four hours later after receiving antihistamines, epinephrine, and intravenous steroids. (*Id.*). The plaintiff then presented at the hospital four times in March 2018 for complications with her allergies. The first visit was on March 6, 2018, when she arrived at the hospital via ambulance for an allergic reaction to the smell of her sheets while changing bedding. (*Id.* at 855, 953-54). The plaintiff had self-administered epinephrine prior to her arrival and was given epinephrine and nebulizer at the hospital. (*Id.*). She was discharged that same day. (*Id.*). On March 17, 2018, the plaintiff arrived at the emergency department for an allergic reaction to smells in crowd of people. (*Id.* at 849-50). She was given supplemental oxygen, epinephrine, and nebulizer. (*Id.*). On March 22, 2018, she arrived at hospital via ambulance for an allergic reaction to fabric softener. (*Id.* at 846). On March 28, the plaintiff arrived at the hospital for an allergic reaction to orange flavoring, for which she received intravenous antihistamines, intravenous steroids, and a nebulizer. (*Id.* at 843).

In April, the plaintiff presented to the hospital twice for allergic reactions. The first was on April 8, 2018, when she arrived at the hospital for an allergic reaction to a cologne worn by someone upstairs from her. (Tr. 841-42). Prior to her arrival at the hospital, the plaintiff had self-administered epinephrine, and at the hospital, she received steroids and intravenous antihistamines before discharge that same day. (*Id.*). On April 13, 2018, the plaintiff arrived at the emergency department via ambulance for an allergic reaction to perfume. (*Id.* at 837, 840). She had self-administered epinephrine before presenting to the hospital. (*Id.*). While in the emergency department, the plaintiff received epinephrine, intravenous antihistamines, and a nebulizer. (*Id.*). She was also noted to have diffusely erythematous skin and prescribed oral prednisone for two more days. (*Id.*).

The plaintiff presented to the hospital with allergy complaints once in May: on May 19, 2018, she arrived at the emergency room for an allergic reaction to perfume while attending a graduation party. (Tr. 916). She had previously self-administered epinephrine and received a nebulizer, steroids, and diphenhydramine in the emergency department. (*Id.*).

The plaintiff's final visit in 2018 was on June 11, 2018, for which the plaintiff arrived at the emergency department after developing throat tightness and dry cough from perfume in her home. (Tr. 835). She had self-administered two doses of epinephrine with mild improvement, but still had lingering throat tightness and a cough prior to her arrival at the hospital. (*Id.*). There were no additional recorded visits in 2018.

The plaintiff's next emergency room visit was over one year later, on October 25, 2019; it was not for allergic reactions, but for "moderate chest pain," which was treated with acetaminophen with advice to follow up with her doctor. (Tr. 1236). In fact, the ALJ noted that the "closest discussion" of an allergic reaction the plaintiff testified to having was in her doctor's

office's waiting room and again at a blood draw station in January 2019, where the examination at the visit and after the incident reflected that the plaintiff had a "slight laryngeal spasm" from a patient's perfume, but "no other shortness of breath or trouble breathing." (*Id.* at 24, 890). Moreover, the ALJ noted that, although the plaintiff claimed to experience allergic reactions "one hundred percent of the time she left home," she was able to travel from Connecticut to North Dakota in May 2018 with no indication that she had experienced an allergic reaction during the trip. (*Id.* at 24; *see also id.* at 914). The ALJ also noted that the plaintiff had been prescribed epinephrine and antihistamines, but nothing more significant for her underlying allergies, and presented with normal respirations and clear lungs at numerous medical visits. (*Id.* at 24; *see e.g.*, *id.* at 487 (05/24/16), 482 (02/03/17), 479 (03/28/17), 431 (06/28/17), 439 (02/15/18), 454 02/22/18), 654 (03/28/18), 825 (04/20/18)). As such, the ALJ found that the overall record evidence did not support the frequency or breadth of the plaintiff's purported allergic reactions of "one to two times per week." (*Id.* at 24).

Though the plaintiff appeared to be seeking medical treatment at least once a week from her alleged onset date to April 13, 2018 (a seven-week period of time), her next instance of medical treatment for her allergies was a month later on May 19, 2018. There is also no evidence of the plaintiff seeking medical attention for her allergies between May 19, 2018 and June 11, 2018, after which she does not appear to be treated for an allergic reaction until January 2019, more than half a year later. The Second Circuit has stated that "[a] lack of supporting evidence . . . where the claimant bears the burden of proof, particularly coupled with other inconsistent evidence, can constitute substantial evidence supporting a denial of benefits." *Reynolds v. Colvin*, 570 F. App'x 45, 47 (2d Cir. 2014) (summary order). As such, the ALJ's credibility determination regarding the

plaintiff's testimony on the frequency and breadth of her allergic reactions was supported by substantial evidence.

Despite finding that the plaintiff's testimony was inconsistent with the medical record evidence, the ALJ still took the plaintiff's allergic reactions into consideration when crafting the RFC. As stated above, the ALJ determined that the plaintiff's RFC included:

> . . . light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can frequently climb ramps or stairs, stoop, kneel, crouch, or crawl. She can never climb ladders, ropes or scaffolds. *She needs to avoid more than occasional exposure to fumes, odors, dusts, gases or poor ventilation* . . .

(Tr. 26) (emphasis added). The plaintiff argues that the ALJ "should have limited [the plaintiff] to no exposure to pulmonary irritants including fumes, odors, dusts, gases and poor ventilation" because "occasionally" means "occurring from very little up to one-third of the time. (Pl.'s Mem. at 12 (citing Soc. Sec. Rul. 83-10)). However, it is the plaintiff's burden to establish that a more restrictive RFC is required. *Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (summary order). She has not done so here, in that she has not pointed to medical evidence indicating that she cannot be exposed to pulmonary irritants "up to one-third of the time," much less at all. But rather than discredit the plaintiff's allergic reactions wholesale, the ALJ indeed considered the severity of the plaintiff's limitations by stating that she needed to avoid "more than occasional" exposure to pulmonary irritants—the ALJ simply did not find those allergies as severe and debilitating as the plaintiff alleged.

Therefore, the ALJ did not err in his RFC determination of the plaintiff because the plaintiff has not met her burden of proof regarding medical record evidence of the frequency and severity of her allergic reactions.

VI.    <u>CONCLUSION</u>

For the reasons stated above, the Court respectfully recommends that the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 20) be **DENIED** and the defendant's Motion to Affirm (Doc. No. 22) be **GRANTED**.

This is a recommended ruling. *See* FED. R. CIV. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days after filing of such order. *See* D. CONN. L. CIV. R. 72.2(a). Any party receiving notice or an order or recommended ruling from the Clerk by mail shall have five (5) additional days to file any objection. *See* D. CONN. L. CIV. R. 72.2(a). Failure to file a timely objection will preclude appellate review. *See* 28 U.S.C. §636(b)(1); Rules 6(a) & 72 of the Federal Rules of Civil Procedure; D. CONN. L. CIV. R. 72.2; *Impala v. United States Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

Dated this 15th day of February, 2022 at New Haven, Connecticut.

  /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge